IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-CR-125-KKD-WC |
| | ) | |
| JON PATRICK PRESLEY | ) | |
| TANNER COOK | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant Jon Patrick Presley ("Defendant Presley") and Defendant Tanner Cook ("Defendant Cook") are charged with violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute marijuana, and 18 U.S.C. § 924(c)(1)(A), possession of a firearm in furtherance of a drug trafficking crime.  Evidence of those alleged crimes was seized after the vehicle in which Defendants were traveling was stopped and subsequently searched. Defendants filed motions to suppress (Docs. 48, 68), which are currently pending before the court.  Defendant Presley's Motion to Suppress (Doc. 48) seeks an order suppressing "all evidence from [Defendant's] vehicle, on his person, and any statements made in conjunction with his arrest."  Def.'s Mot. (Doc. 48) at 1.  Defendant Presley argues the evidence against him should be suppressed because: (1) there was no probable cause for the traffic stop; (2) the length of the detention for the traffic stop was too long and thus constitutes an illegal arrest; (3) there was no probable cause to search Defendant Presley's vehicle; and (4) Defendant Presley's "arrest and subsequent search and seizure of his vehicle were illegal as a matter of law."  *Id*. at 1-7.  Defendant Cook's Motion to Suppress (Doc. 68) seeks an order "suppressing all evidence from the vehicle, on his person, and any

statements made in conjunction with his arrest." Doc. 68 at 1. Defendant Cook argues the evidence against him should be suppressed because: (1) there was no probable cause for the traffic stop; (2) if there was probable cause, the stop was unreasonably pretextual; (3) the length of detention for the traffic stop was too long and thus constitutes an illegal arrest; and (4) there was no reasonable suspicion to search the vehicle in which Defendant Cook was a passenger. *Id*. at 5-10.

The Government responded (Doc. 69) to the motions and, on July 26, 2016, the undersigned conducted a suppression hearing on the matter at which the Government presented testimony and evidence in support of the lawfulness of Defendants' arrest. The matter is now ripe for report and recommendation to the District Judge. Upon consideration of Defendants' motions, the Government's response, and the evidence and testimony adduced at the suppression hearing, the undersigned Magistrate Judge RECOMMENDS that Defendants' motions to suppress be DENIED.

## I.     FINDINGS OF FACT[1]

On April 7, 2016, Ty Thompson ("Officer Thompson"), an officer with the Prattville Police Department attached to the Drug Enforcement Agency ("DEA") High Intensity Drug Trafficking Area ("HIDTA"), began working with a DEA-documented confidential informant ("CI") regarding a potential large-scale marijuana deal that was to take place in the Montgomery, Alabama, area on or around April 10, 2016.   Supp. Hearing Transcript

---

[1]  The court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

(Doc. 75) at 8:4-5; 9:5-19; 23:5-8.  Prior to April 7, 2016, Officer Thompson had not worked with the CI, and Officer Thompson was unaware of any specific cases in which the CI had previously proved reliable.  *Id*. at 23:5-24:15.  During his initial contact with the CI, Officer Thompson learned that the potential deal was for approximately one hundred fifty pounds of hydroponic marijuana, which was to be delivered to Montgomery, Alabama, from California.  *Id*. at 9:16-25.  The CI also provided Officer Thompson with the phone number, initials (J.P.), and description of one of the individuals who would be allegedly transporting the drugs into Montgomery.  *Id*. at 10:1-9.  Through the phone number provided by the CI, Officer Thompson ascertained that J.P. was Jon Patrick Presley ("Defendant Presley").  *Id*. at 10:4-9.

Over the next few days, Officer Thompson maintained contact with the CI, who maintained contact with Defendant Presley.  *Id*. at 10:14-23; 12:6-9.  Through his relationship with the CI, Officer Thompson listened in on approximately ten conversations between the CI and Defendant Presley, eight of which were recorded.[2]  *Id*.  From those conversations, Officer Thompson learned that the individuals allegedly transporting the marijuana would be traveling in a cargo van without windows, rented from Enterprise Rent-A-Car ("Enterprise"), and that a rented, black Lincoln Navigator would serve as a trail vehicle for the van.  *Id*. at 11:2-7; 11:13-17.  On April 8, 2016, Officer Thompson confirmed that Defendant Presley rented a 2016 Dodge Ram cargo van from Enterprise in Los Angeles, California.  *Id*. at 11:2-12.

---

[2] Although the recorded conversations were referenced during the suppression hearing before the undersigned, none were played in court or introduced into evidence.

In addition to the aforementioned vehicle descriptions, the phone calls between the CI and Defendant Presley provided Officer Thompson with a timeline of events for the transportation of the marijuana. *Id*. at 13:6-10. Specifically, Officer Thompson learned that Defendant Presley and his unidentified cohorts left California on April 8, 2016, between 11 a.m. and 1 p.m., central standard time ("CST"). *Id*. at 11:21-25. Based upon that information, Officer Thompson devised a plan with the drug interdiction unit of the Alabama State Troopers Fugitive Apprehension ("FAP") team to intercept the vehicles as they travelled down Interstate 65 South ("I-65S") into Montgomery. *Id*. at 13:18-14:2; 15:4-7. According to Officer Thompson, the plan was for the FAP team members to "effect a traffic stop with probable cause." *Id*. at 15:2-7; 22:24-23:4.

On April 10, 2016, Officer Thompson listened to several phone conversations between Defendant Presley and the CI. Those conversations gave him specific details about Defendants' locations, and Officer Thompson relayed that information to the FAP team as he received it. *Id*. at 17:9-11. At 1:35 p.m., CST, Defendant Presley phoned the CI and stated that he was two hours from Montgomery, and wanted to meet the CI "somewhere in the middle" between Montgomery and his current location. *Id*. at 15:15-22. At 4:17 p.m., CST, Defendant Presley phoned the CI and stated that he was "still approximately two hours outside of Montgomery and that they had stopped to eat at Cracker Barrel." *Id*. at 16:2-8. At 5:45 p.m., CST, Defendant Presley phoned the CI and stated that they were sixty-five miles from Montgomery, and that they had already passed Birmingham. *Id*. at 16:10-13. Officer Thompson relayed that information to the FAP team as he received it. *Id*. at 17:9-11. At 5:55 p.m., CST, a FAP team member notified Officer

Thompson that a white Enterprise rental van, followed by a black Lincoln Navigator, had been spotted at mile-marker 218 on I-65S. *Id.* at 17:17-20.  At 6:15 p.m., CST, troopers stopped the Navigator.[3]  At 6:20 p.m., CST, Chris Faulk ("Trooper Faulk"), who is a trooper with the Alabama Law Enforcement Agency that was working with the FAP team at the time, stopped the van. *Id.* at 17:23-25.

Defendant Presley was driving the van, and Defendant Tanner Cook ("Defendant Cook") was a passenger. *Id.* at 52:9-10; 55:19-20.  Dash-cam video from Trooper Faulk's vehicle gives a complete, play-by-play of the stop and subsequent interaction.  Gov't Ex. 1.  At approximately 1:27[4] in the video, the stop is made on Defendants' vehicle. *Id.*  When Trooper Faulk approaches the van, he tells Defendants that they are being stopped for two reasons: (1) improper lane change, and (2) following too closely to a vehicle in front of them. *Id.* at 2:08.  Trooper Faulk then asks Defendant Presley to accompany him to his vehicle while he checks Defendant Presley's license and registration. *Id.* at 3:27.  Defendant Presley does so without protest, and sits in the passenger seat of Trooper Faulk's vehicle while a license check is performed. *Id.* at 3:45.  Defendant Cook remains in the van. *Id.*  While in Trooper Faulk's vehicle, Trooper Faulk asks Defendant Presley about his travel plans, and Defendant Presley states that he and Defendant Cook, as members of

---

[3] A third defendant in this case, Joseph Christopher Ybarra, was driving the Navigator.  Suppression is not sought with regards to the contents of the Navigator.

[4] The court will use the above-styled, "minute:second" format to designate the time at which relevant events occurred on the dash-cam video.  As a point of clarification, this format does not indicate the time of day that the events occurred.

a film crew, are traveling to Georgia to film the end of the Masters Tournament.  *Id*. at 4:58.

At 13:48, Trooper Faulk issues Defendant Presley a warning citation.  He then asks Defendant Presley about Defendant Cook and why he was acting "so nervous."  *Id*.  When asked if anything illegal was in the van, Defendant Presley responds "no."  *Id*. at 14:32.  At 14:56, after being asked if the van could be searched, Defendant Presley responds: "I would rather not."  Trooper Faulk informs Defendant Presley that, since he is refusing consent to search, the canine unit will be called to perform a perimeter search of the van.  *Id*. at 15:00. At 15:50, the canine unit is called.

While waiting for the canine unit to arrive, Trooper Faulk walks to the passenger side of the van and begins questioning Defendant Cook.  *Id*. at 16:00.  He tells Defendant Cook that he appears nervous.  *Id*. at 16:43.  He then tells Defendant Cook that Defendant Presley has refused consent to search the van, and that a canine unit is in route to perform an open-air search.  *Id*. at 17:07.  Defendant Cook exits the van, and stands beside the passenger door.  *Id*. at 17:35.  Trooper Faulk returns to his vehicle and runs Defendant Cook's license.  *Id*. at 22:32.  After performing the check, Trooper Faulk informs Defendant Presley, who is still seated in the passenger seat of Trooper Faulk's vehicle, that something is wrong with Defendant Cook's license.  *Id*. at 27:08.

At 28:31, Trooper Brian Hamrick ("Trooper Hamrick"), who is a member of the FAP team and canine unit, arrived at the scene with his certified, drug-sniffing dog, Diesel. Doc. 75 at 89:16-24.  Defendant Cook walks to the front, passenger side of Trooper Faulk's

vehicle.  Gov't's Ex. 1 at 28:48.  At 29:21, the perimeter search of the van begins.  At 29:50, Diesel alerts.

After Diesel alerts, Trooper Faulk and Trooper Hamrick search the inside of the van. *Id*. at 31:30.  Shortly into the search, Trooper Faulk and Trooper Hamrick discover an empty gun holster in the van's console.  *Id*. at 31:40.  Trooper Faulk and Trooper Hamrick immediately approach Defendants.  *Id*.  Trooper Hamrick pats down Defendant Cook while Trooper Faulk asks Defendant Presley where the gun belonging to the holster is located. *Id*. at 31:57.  Defendant Presley informs Trooper Faulk where the gun is located.  *Id*. at 32:19.  At 32:39, Defendant Cook and Defendant Presley are handcuffed and told that they are not under arrest, but are being detained.  The roadside search of the vehicle ends at 62:16.

After the conclusion of the roadside search, Defendant Presley and Defendant Cook were transported to the Autauga County Jail.  Doc. 75 at 30:17-22.  After arriving at the jail, Officer Thompson and Special Agent Devin Whittle were assigned to speak with Defendants.  *Id*. at 30:22-25; Doc. 48-1 at 17:16-18.  At some point after their arrival, Officer Thompson and Special Agent Whittle attempted to talk to Defendant Presley.  Doc. 75 at 33:14-16.  Defendant Presley invoked his right to an attorney.[5]   Doc. 48-1 at 17:16-20.  However, Defendant Presley asked to speak to Defendant Cook and Defendant Ybarra. Doc. 75 at 33:14-22; Doc. 48-1 at 17:18-20.  The three were placed in an interview room

---

[5] It is not clear to the undersigned from the suppression hearing or from Defendant Presley's motion to suppress that he invoked his right to remain silent or his right to an attorney.  However, from reviewing the transcript of the preliminary hearing, it appears that, at the time Defendant Presley was interviewed, Defendant Presley "invoked his right and said he wanted a lawyer."  Doc. 48-1 at 17:16-20; 18:5-8.

that was wired for recording. [6]   Doc. 75 at 34:1-3.   Defendants were not informed that officers were listening to their conversations or that they were being recorded.  *Id*. at 34:4-14.

Subsequent to being placed in the wired interview room, Defendant Cook executed a document stating that he did not wish to talk to police.  *Id*. at 30:22-25; 30:15-18.  Despite the fact that neither Defendant requested to speak with the police after the forms were executed, officers entered the conference room and suggested to Defendants that they could help themselves by agreeing to finish the deal.  *Id*. at 35:17-22; Doc. 48-1 at 53:20-23. Officers returned Defendant Presley's cell phone to him, and Defendant Presley phoned the individual with whom he was planning to complete the transaction.  Doc. 48-1 at 43:3-26.  The individual did not agree to complete the buy.  *Id*.  During the time that Defendant Presley was in control of his cell phone, he wiped it clean of its information.  *Id*. at 32:16-33:3.

Ultimately, the search of the van produced one hundred, seventy-seven pounds of marijuana, vacuum sealed inside duffel bags, along with six firearms.  Doc. 75 at 4:17-21; Doc. 68 at 2.

## II.   DEFENDANTS' ARGUMENTS

Defendant Presley moves the court for an order suppressing "all evidence from [his] vehicle, on his person, and any statements made in conjunction with his arrest."  Def.

---

[6] Although the undersigned assumes from testimony at the suppression hearing that a recording exists documenting the conversations of Defendants in the interview room, no such recording was viewed or introduced into evidence at the hearing.  As such, the undersigned is without sufficient information to know the content of such conversations, or the timeframe in which the events discussed above occurred.

Presley's Mot. (Doc. 48) at 1.   Defendant Presley presents four issues for the court's resolution: (1) "there was no probable cause for the traffic stop"; (2) "the length of the detention was too long and therefore amounts to an illegal arrest"; (3) "there was no probable cause to search [Defendant Presley's] vehicle"; and (4) "Defendant Presley's arrest and subsequent search and seizure of his vehicle were illegal as a matter of law." *Id.* at 3.

First, Defendant Presley contends that the traffic stop was unconstitutional because the dash-cam video shows that the van committed no traffic violations, despite being stopped for improper lane usage and following too closely to another vehicle.   Defendant Presley argues that no probable cause existed to stop the van; thus, his Fourth Amendment rights were violated, "as he was the subject of an unlawful search and seizure of his property." *Id.* at 5.

Second, Defendant Presley contends that the length of his detention was too long and therefore amounts to an illegal arrest.  *Id*.   Specifically, Defendant Presley argues that "the traffic stop should have ended with the warning issued" but, instead, Trooper Faulk conducted a criminal background check—while Defendant Presley was in the Trooper's vehicle—after Defendant Presley refused a consensual search of his van.  *Id*. at 6.   As such, Defendant Presley asserts that this "constituted an unreasonable delay, which lasted longer than necessary to process the traffic violation and was an act that was beyond the scope of the facts that Trooper Faulk believed justified the stop, escalating a traffic stop to an illegal arrest." *Id*.

Third, Defendant Presley contends that there was no probable cause to search the van.   Defendant Presley argues that, considering the circumstances, Trooper Faulk "ordered an unreasonable seizure when he called for a canine search unit for a traffic warning, without the requisite probable cause." *Id*. at 6.  Further, Defendant Presley alleges that "it is not clear from the video that the canine . . . actually alerted to anything." *Id*.

Finally, Defendant Presley contends that "[a]s [D]efendant [Presley] was illegally stopped, and wrongfully detained, his arrest and eventual search and seizure of his property were improper.  Anything found by these acts should be suppressed by the court as a violation of the [Defendant Presley's] 4th Amendment Protection against unlawful search and seizure." *Id*.

In summary, Defendant Presley argues that he was "the subject of an illegal traffic stop, illegal detention, illegal search and seizure of his property.  Therefore, the court should suppress all evidence related to the traffic stop, detention, illegal arrest, and illegal search and seizure of [his] property." *Id*. at 7.

Defendant Cook moves the court for an order suppressing "all evidence from the vehicle, on his person, and any statements made in conjunction with his arrest."  Def. Cook's Mot. (Doc. 68) at 1.  Defendant Cook presents four issues for the court's resolution: (1) there was no probable cause for the traffic stop; (2) the traffic stop was illegal regardless of probable cause because the stop was based on pretextual reasons; (3) the length of the detention associated with the traffic stop was too long and thus was an illegal arrest; and (4) there was no reasonable suspicion to search the van in which Defendant Cook was a passenger. *Id.* at 5-10.

10

First, Defendant Cook contends that the traffic stop was unconstitutional because the dash-cam video shows that the van committed no traffic violations, despite being stopped for improper lane usage and following too closely to another vehicle.  Defendant Cook argues that no probable cause existed to stop the van; thus, his Fourth Amendment rights were violated "due to an illegal detention without probable cause, which further lead [sic] to an illegal search and seizure."  *Id.* at 6.

Second, Defendant Cook contends that even if there was probable cause to stop the van, the investigatory stop was "unreasonably pretextual."  *Id*. at 7.  Specifically, Defendant Cook argues that "[t]he reality is that the Troopers had no interest in issuing a traffic citation or conducting an investigation concerning impaired driving.  A reasonable officer would not have stopped the cargo van, absent the motivation the Trooper's [sic] had in this case to search the vehicle. . . . The reasons given by the Troopers for stopping the vehicle are clearly pretextual."  *Id*.

Third, Defendant Cook contends that the length of the detention associated with the traffic stop was too long, and thus was an illegal arrest.  *Id*. at 7-9.  Defendant Cook argues that "Troopers had concluded the traffic stop and all necessary steps as allowed by law to complete the mission of the traffic stop prior to bringing in the dog to sniff. . . . The further delay involved in allowing the dog to sniff violated [Defendant] Cook's 4th Amendment protections against unreasonable search and seizure, and amounted to an illegal arrest, no matter how minimal the delay may have been."  *Id*. at 8-9.

Finally, Defendant Cook contends that "[f]ollowing the illegal stop of the vehicle there was no reasonable suspicion to further detain [Defendant] Cook while a dog sniffed

for drugs or to conduct a search of the vehicle." *Id*. at 9.  Defendant Cook asserts that

nothing occurred between the time that a warning citation was written and the time the dog

was brought in to search the vehicle other than "the assertion of the constitutional right to

refuse a search." *Id*. at 10.  Defendant Cook contends that this "suggest[s] that the true

reason for the search of the vehicle was the refusal to allow the search of the cargo van[,]"

which does not meet the reasonable suspicion needed to conduct the search. *Id*.

In summary, Defendant Cook argues that he "was subjected to an illegal traffic stop,

illegal detention, and illegal search and seizure of property.  Therefore, he requests that the

court suppress all evidence discovered due to the traffic stop, detention, illegal arrest, and

illegal search and seizure of the property recovered from the cargo van, on his person, and

any statements made by [Defendant] Cook." *Id*. at 10.

## III.   THE GOVERNMENT'S RESPONSE

In response, the Government argues that, regardless of whether the traffic stop was

pretextual, the information provided by the CI "established reasonable suspicion to conduct

[the] traffic stop of the vehicle[ ] even in the absence of probable cause to believe . . . a

traffic offense [was committed]."  Doc. 69 at 4.  With regards to the length of Defendants'

detention, the Government argues that the officers "had articulable suspicion of other

illegal activity" based upon the information given them by the CI, which allowed

Defendants to be detained further than the time necessary to conduct the stop. *Id*. at 5.

With regards to whether probable cause existed to search the vehicle, the Government

appears to argue the automobile exception to the search warrant requirement.[7]  *Id*. at 5.
The Government asserts that officers "had a reasonable suspicion that [Defendants] were
trafficking narcotics in the cargo can [sic] in which they were travelling.  [Defendants]
refused to give consent to a search of the vehicle.  When a trained drug-sniffing dog was
brought to the vehicle, he alerted to the presence of narcotics within.  This created sufficient
probable cause for the troopers to conduct a warrantless search of the van."  *Id*. at 6.

## IV.    APPLICABLE LAW

Before delving into the details of the current case, the undersigned reviews the
Fourth Amendment and its protections.  The Fourth Amendment to the United States
Constitution guarantees the right of individuals "to be secure in their persons, houses,
papers, and effects, against unreasonable searches and seizure."  U.S. Const. amend. IV.
In general, a seizure of the person, as applicable to Fourth Amendment protections, occurs
when police conduct would communicate to a reasonable person, taking into account the
circumstances surrounding the encounter, that the person is not free to ignore the police
presence and leave at his will.  *United States v. Mendenhall*, 466 U.S. 544, 554 (1980).  In
general, a search, as applicable to Fourth Amendment protections, occurs when a
governmental employee or agent violates a person's reasonable expectation of privacy.
*United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("A search occurs when an expectation
of privacy that society is prepared to consider reasonable is infringed.").  A seizure of

---

[7] Although the Government never explicitly refers to the "automobile exception" for a warrantless search
in its brief, it does quote the exception.  Doc. 69 at 5 ("'If a car is readily movable and probable cause exists
to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without
more.' *California v. Carney*, 471 U.S. 386, 390 (1985).").

property discovered as a result of such a search occurs when there is some meaningful interference with a person's possessory interests in that property.  *Id.*

A. *Fourth Amendment Protections Against Seizures*

Generally, the Fourth Amendment protects against unreasonable seizures.  U.S. Const. amend. IV.  In determining whether a seizure is reasonable, the type of encounter between police and the citizen determines the amount of Fourth Amendment scrutiny to be applied.  *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  The Supreme Court has identified at least three levels of scrutiny to be applied to police-citizen encounters:

> (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown . . . custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975).

*Perkins*, 348 F.3d at 969.

Brief, consensual and non-coercive interactions between police and citizens, the first category addressed above, do not require any particular level of suspicion on the part of the officer and are not viewed as seizures under the Fourth Amendment.  *United States v. Griffin*, 696 F.3d 1354, 1360 (11th Cir. 2012) (quoting *Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("The Supreme Court has 'held repeatedly that mere police questioning does not constitute a seizure.'")).

The second category, investigative stops short of arrests—including traffic stops— are governed by *Terry v. Ohio*, and are subjected to limited Fourth Amendment scrutiny requiring only a reasonable suspicion of criminal wrongdoing.  392 U.S. 1, 30 (1968).

While such stops are "seizure[s] within the meaning of the Fourth Amendment," *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), they are "constitutional if [they are] *either* based upon probable cause to believe a traffic violation has occurred *or* justified by reasonable suspicion as set forth in *Terry*." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam) (citing *United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003)) (emphasis added). When determining if probable cause exists "to believe a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'" *Id*. at 1337 (citing *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)). When determining if reasonable suspicion exists for a *Terry* stop, an officer may briefly stop and detain an individual for investigation if the officer reasonably suspects that criminal activity is afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Reasonable suspicion, which is determined from the collective knowledge of all officers involved in the stop, demands "considerably less" than probable cause, but "police are required to articulate some minimal, objective justification for the stop." *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996); *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989). Courts look to the totality of the circumstances to ascertain "whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Terry stops may not last "any longer than necessary to process the violation." *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997). Unless the encounter becomes consensual, an officer's continued detention of a vehicle's occupants is authorized

under the Fourth Amendment *only* if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Griffin*, 109 F. 3d at 708; *accord Holloman*, 113 F.3d at 196.  In addition to the time restraints imposed upon *Terry* stops, an officer's actions during such a stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

The third category, technical arrests or custodial detentions, require an arrest warrant or that an officer have probable cause to believe that a crime has occurred.  *United States v. Watson*, 423 U.S. 411, 415 (1976).  "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime."  *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (internal quotation omitted).  Probable cause does not require overwhelmingly convincing evidence, but only "reasonably trustworthy information." *Marx v. Grumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

### B.  Fourth Amendment Protections Against Searches

In general, the Fourth Amendment protects against searches that are unreasonable. U.S. Const. amend. IV.  "[T]o claim protections of the Fourth Amendment, a Defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."[8]  *Viezca*, 55 F. Supp. 2d at 1260 (citing *United*

---

[8] "A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it."  *United States v. Leal*, No. 3:03-cr-31-J-32HTS, 2003

*States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999)).  Ordinarily, a warrant based upon probable cause must issue prior to a search taking place.  However, there is an exception for automobiles.  *United States v. Walker*, No. 3:05-cr-108-J-32MMH, 2005 WL 5949674, at *13 (M.D. Fla. Oct. 5, 2005) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). Under the automobile exception, an officer is permitted to conduct a warrantless search of a vehicle when: "(1) there is probable cause to believe the vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure."[9]  *United States v. Talley*, 108 F.3d 277, 281 (11th Cir. 1997).  Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found."  *Sokolow*, 490 U.S. at 7.  "While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992).

Probable cause may be established through the use of a CI.  In determining whether a CI's tip rises to the level of probable cause, courts look to the totality of the circumstances.  *United States v. Campbell*, 920 F.2d 793, 796 (11th Cir. 1991) (citing *Illinois v. Gates,* 462 U.S. 213, 230 (1983) (rejecting the rigid "two-pronged test" under

WL 21665126, at *6 (M.D. Fla. March 28, 2003) (citing *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998)).  Defendant Cook was not the driver of the van that was stopped by Trooper Faulk, nor did he rent the van. Doc. 75 at 11:2-12; 52:9-10; 55:19-20.  To the extent Defendant Cook is challenging the propriety of the search based upon a privacy interest in the van, Defendant Cook's presence in the vehicle is not sufficient to establish standing.  *See United States v. Viezca*, 555 F. Supp. 2d 1254, 1260 (M.D. Ala. 2008).  However, to the extent that Defendant Cook alleges that the traffic stop and his subsequent detention were unlawful, he does have standing.  "A passenger in a vehicle generally has standing to challenge the legality of the initial stop and detention."  *Id.* at 1261 (citing *Leal*, 2003 WL 21665126, at *7).

[9] A separate showing of exigency is not required when a vehicle is readily movable.  *Dyson*, 527 U.S. at 467.

*Aguilar v. Texas,* 378 U.S. 108 (1964), and *Spinelli v. United States,* 393 U.S. 410 (1969), for determining whether a CI's tip establishes probable cause for issuance of a warrant and adopting a "totality-of-the-circumstances" approach)).   "We consider the relevance of factors such as the [CI's] veracity, reliability, and bases of knowledge." *U.S. v. Gonzalez,* 969 F.2d 999, 1003 (11th Cir. 1992) (citing *Gates,* 462 U.S. at 230).   Factors to consider are: (1) whether the information provided, if untrue, places the CI at risk for negative repercussions because the CI is not anonymous, *Breeding ex rel. C.B. v. Driscoll,* 82 F.3d 383, 388 (11th Cir. 1996); (2) whether the information provided is specific information typically known only by someone with personal knowledge, *United States v. Kent,* 691 F.2d 1376, 1381 (11th Cir. 1982); (3) whether the information is capable of objective verification, *id.;* (4) whether the information provides details about "future actions of third parties ordinarily not easily predicted" that later occur, *Gates,* 462 U.S. at 245; (5) whether there is a past history between the informant and the police department that supports reliability, *id.;* and (6) whether the information was stale at the time it was received by officers, *United States v. Harris,* 20 F.3d 445, 450 (11th Cir. 1994).

## V.   DISCUSSION

Applying the aforementioned case law, the undersigned concludes that Defendants' Fourth Amendment rights were not violated.   Defendants' motions to suppress fail under two, separate theories.   The court will discuss each, in turn.

### A. *The Automobile Exception Applies to the Search of the Van.*[10]

As noted above, an officer is permitted to conduct a warrantless vehicle search when "(1) there is probable cause to believe the vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure." *Talley*, 108 F.3d at 281. Because a separate showing of exigency is not required when the vehicle is readily movable,[11] *Dyson*, 527 U.S. 467, the court will focus solely on whether there was probable cause to search the van.

Under the totality of the circumstances, the undersigned concludes that probable cause existed to detain Defendants and search the van based upon information provided by the CI. Indeed, five of the six non-exclusive factors previously identified for determining whether information from a CI rises to the level of probable cause are satisfied in this case. The court will examine each factor below.

*Factor 1: Whether the tip places the informant at risk for negative repercussions if untrue because the CI is not anonymous.*

Here, the CI was not anonymous, but was instead a DEA-documented source. Doc. 75 at 37:6-15. Testimony indicates that the CI was not a paid informant, but he was

---

[10] In the Government's response to Defendants' motions, the Government quotes the automobile exception as part of its argument for probable cause to search the van. Doc. 69 at 5. The Government then argues that probable cause arose when Diesel alerted to the presence of narcotics in the van. *Id.* However, as explained above, probable cause existed prior to the stop of Defendants' van based upon the information provided by the CI. The fact that the Government is pointing to a different source for probable cause—or even if the Government was not intending to argue the automobile exception at all—is not problematic. *See United States v. Talley*, 108 F.3d 277, 281 (1997) (rejecting the Government's argument that a *Terry* stop matured into an arrest based upon probable cause which allowed a search incident to arrest and agreeing with the district court's "reasoned approach" of applying the automobile exception)).

[11] The court notes that the van in this case was readily movable. Dash-cam video of the stop shows an officer driving the van away after the roadside search concluded. *See* Gov't's Ex. 1.

"working off cases."  Doc. 75 at 28:13-15.  As such, the CI could easily be tracked down if the information he provided was untrue, and, being that he was working off cases, he was at risk for negative repercussions if the information he provided was untrue.  Further, the CI was subject to exposure because he had direct contact with Defendant Presley.  He was not anonymous to the officers or to at least one of the Defendants.  Thus, the court concludes that the CI's exposure and lack of anonymity supports the CI's inclination for truthfulness, and favors the establishment of probable cause.

*Factor 2: Whether the tip provides specific information typically known only by someone with personal knowledge.*

Here, the CI engaged Defendant Presley in telephone conversations that were listened to and recorded by Officer Thompson.  Through the conversations between the CI and Defendant Presley, Officer Thompson knew specific details of Defendants' whereabouts.  Officer Thompson knew that, at 1:35 p.m., CST, on April 10, 2016, Defendants were two hours from Montgomery.  *Id*. at 15:15-22.  At 4:17 p.m., CST, Officer Thompson knew that Defendants were "still approximately two hours outside of Montgomery and that they had stopped to eat at Cracker Barrel."  *Id*. at 16:2-8.  At 5:45 p.m., CST, Officer Thompson knew that Defendants were sixty-five miles from Montgomery, and that they had already passed Birmingham.  *Id*. at 16:10-13.  This type of specificity—combined with the manner in which it was provided—supports the veracity and reliability of the CI's information, and favors the establishment of probable cause.

*Factor 3: Whether the information is capable of objective verification.*

Officer Thompson's discussions with the CI provided him with information that Defendant Presley had rented a cargo van from Enterprise to transport marijuana across the country. *Id*. at 11:2-7; 11:13-17. Officer Thompson confirmed that Defendant Presley rented a 2016 Dodge cargo van from Enterprise in California on April 8, 2016. *Id*. at 11:2-12. Officer Thompson was able to make this verification prior to April 10, 2016. *Id*. Officer Thompson was also informed that a black Lincoln Navigator would serve as a trail car for the van. *Id*. at 11:2-7; 11:13-17. Felony Apprehension team members stationed on I-65S confirmed that a black Lincoln Navigator was following an Enterprise van prior to the stop. *Id*. at 17:17-20. Felony Apprehension team members confirmed that the vehicles had California plates. *Id*. at 85:23-24; 46:1. Thus, the information provided by the CI was capable of objective verification and was, in fact, verified. The court concludes that this supports the reliability of the information provided by the CI, and favors the establishment of probable cause.

*Factor 4: Whether the tip provides details about "future actions of third parties ordinarily not easily predicted" that later occur.*

Undoubtedly, making a trip from California to Montgomery, Alabama, carries with it many variables. However, at 5:45 p.m., CST, on April 10, 2016, Officer Thompson knew that Defendants were sixty-five miles from Montgomery, and that they had already passed Birmingham. *Id*. at 16:10-13. Ten minutes later, Defendants were spotted in Chilton County near mile-marker 218 and were subsequently stopped in Autauga County at 6:20 p.m., CST. *Id*. at 17:17-20; 17:23-25. The fact that the information provided by

the CI allowed officers to pinpoint Defendants' entry into the Montgomery area within such a small window of time compared to the longevity of Defendants' trip supports the reliability of the information, and favors the establishment of probable cause.

*Factor 5: Whether there is a past history between the informant and the police department that supports reliability.*

There was no past history between the informant and Officer Thompson that would support the reliability of the CI. *Id*. at 23:15-17. Further, Officer Thompson did not question the Birmingham-area law enforcement agents about the reliability of the CI, or specifics about cases that the CI had previously assisted the other agents with. *Id*. at 26:14-25. However, the CI was a DEA-documented source. *Id*. at 36:5-15. It stands to reason that, had the CI *not* been reliable to the officers in Birmingham, they would not have passed him along to the officers in this case. Or, it stands to reason that if the CI had proven unreliable to the Birmingham-area officers, those officers would have at least warned Officer Thompson regarding that fact. Nonetheless, the court cannot ignore that Officer Thompson had not previously dealt with this particular CI, and that Officer Thompson did not have knowledge—at the time he was engaging the CI—about his reliability with the Birmingham-area officers. Although a close call, the court concludes that Officer Thompson's lack of knowledge about and exposure to the CI does not favor the establishment of probable cause.

*Factor 6: Whether the information was stale when it was received by officers.*

Stale information does not bode well for the establishment of probable cause. *See Harris*, 20 F.3d at 451 (noting that "[w]arrant applications based upon stale information

fail to create a probable cause that similar or other improper conduct is continuing."). In this case, however, the information received by Officer Thompson was over a three-day period, and was in real-time. Doc. 75 at 9:5-19; 23:5-8. There was little doubt, because of the circumstances in which the information was collected, that criminal activity was ongoing. Indeed, Officer Thompson received information through the CI's phone calls with Defendant Presley ten minutes before the vehicles were actually spotted on I-65S. *Id.* at 16:10-13; 17:17-20. The fact that the CI's information was anything but stale favors the reliability of the information and the establishment of probable cause.

*Totality of the Circumstances*

Under the totality of the circumstances, the undersigned concludes that the information provided by the CI established probable cause to conduct a warrantless search of the van. Particularly, the court is persuaded by the circumstances under which the confidential information was collected. Considering that much of the information received was, for all intents and purposes, from Defendant Presley himself, it would stand to reason that officers believed the information to be highly truthful and reliable. In addition, officers were able to verify critical pieces of information through independent investigation prior to making the stop on the van, which bolstered their belief in the credibility of the information. Further, the fact that the CI was not anonymous, and was identifiable by both law enforcement and Defendant Presley, supports the conclusion that the information was truthful. Although Officer Thompson had never worked with the CI previously, nor had he determined that the CI had proven reliable in prior engagements with Birmingham-area law enforcement, that is not detrimental under a totality-of-the-circumstances evaluation.

All things considered, the undersigned concludes that the CI's information provided law enforcement the probable cause needed to perform a warrantless search of the van. As such, no Fourth Amendment violation occurred when Defendants were detained and their van was searched.

### B. The CI's Information Provided Officers with Reasonable Suspicion to Stop the Van and to Detain Defendants Further Until Probable Cause to Search the Van was Established with an Open-Air Canine Sniff.

In the alternative to the application of the automobile exception, Defendants' motions to suppress fail because the CI's information provided officers with reasonable suspicion to stop the van and to detain Defendants further until probable cause to search the van was established with an open-air canine sniff.

In *Terry,* the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe,* 470 U.S. 675, 682 (1985) (citing *Terry,* 392 U.S. at 20); *see also United States v. Powell,* 222 F.3d 913, 917 (11th Cir. 2000). Under *Terry's* two-part inquiry, a court examines: (1) "'whether the officer's action was justified at its inception,'" *Powell,* 222 F.3d at 917 (quoting *Terry,* 392 U.S. at 20); and (2) whether the stop went too far and matured into arrest before there was probable cause. The first part of the inquiry turns on whether the officers had probable cause that a traffic violation occurred *or* a reasonable suspicion that criminal activity was afoot. *Id.* The second part of the inquiry requires a court to consider "'whether [the officer's actions were] reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry,* 392 U.S. at 20).

As discussed further below, the undersigned concludes that the information provided by the CI established reasonable suspicion that Defendants were engaged in, or were about to engage in, criminal activity.  As such, the initial stop of the van was legal. Further, the undersigned concludes that, based upon the circumstances that justified the stop, the Trooper Faulk's actions were reasonably related in scope to those circumstances. As such, no Fourth Amendment violation occurred.

*The Initial Stop of the Van was Legal.*

To be justified at its inception, an officer making a *Terry* stop must be able to articulate some minimal, objective justification for the stop that is based upon the officer's reasonable suspicion that the individual is engaged in, or is about to engage in, criminal conduct.  *Mikell*, 102 F.3d at 475; *Williams*, 876 F.2d at 1524.  Whether that objectively reasonable suspicion has been established depends upon the totality of the circumstances, and courts consider "the collective knowledge of the officers involved in the stop."  *United States v. Sokolow,* 490 U.S. 1, 7-8; *Williams*, 876 F.2d at 1524.  "Reasonable suspicion may be 'based on information provided by a confidential informant, if the information possesses "an indicia of reliability."'"  *United States v. Zamora*, 661 F.3d 200, 207 (5th Cir. 2011) (citing *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993)).  In this case, the officers had more than enough reasonable suspicion that Defendants were involved in criminal activity.  As discussed in the previous section, the information provided by the CI was specific, it provided a first-hand, real-time account of Defendants' travels, and it was verified by independent investigation.  Clearly, once detailed information provided by the CI was corroborated, it gave officers reasonable suspicion that criminal activity was afoot.

25

Because officers had objectively reasonable suspicion to stop the van based upon the information from the CI—and because *Terry* does not require more—the initial stop of the van was legal.[12]

*Trooper Faulk's Subsequent Actions Were Reasonably Related in Scope to the Circumstances that Caused him to Stop the Van.*

Having concluded that the stop was justified at its inception based upon a reasonable suspicion that Defendants were engaged in criminal activity, the undersigned must now determine whether Trooper Faulk's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place and whether the detention, which continued after the processing of the traffic violation, was permitted. *See Sharpe*, 470 U.S. at 682 (quoting *Terry*, 392 U.S. at 20); *Holloman*, 113 F.3d at 196; *Griffin*, 109 F.3d at 708.

> There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required.  The difference is one of extent, with the line of demarcation resulting from the weighing of a 'limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety.'

---

[12] Because Officer Thompson indicated to FAP team members that they needed to develop their own independent probable cause to stop the van, Defendants hinge their Fourth Amendment challenges on whether there was probable cause to stop the van based upon the alleged traffic violations. *See, generally*, Docs. 48 & 68.  The undersigned agrees with Defendants that the alleged lane change violation cannot be seen on the dash-cam video.  However, regardless of whether there was a traffic violation, Trooper Faulk had reasonable suspicion, at a minimum, to stop the van based upon the information provided by the CI. Defendants have cited no case law, and the undersigned has located no case law, that indicates that the reason stated by law enforcement for the stop must be truthful, or that a possible failed attempt at establishing probable cause to stop through a traffic violation invalidates the reasonable suspicion to stop based on criminal activity established separately through a CI.  Here, while Officer Thompson told the FAP team that they needed to establish independent probable cause, and while Trooper Faulk told Defendants that they were being stopped for two traffic violations, this is not problematic to the determination that there was reasonable suspicion to stop the van based upon the information from the CI.

*United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004) (quoting *Dunaway v. New York*, 442 U.S. 200, 209 (1979)).

To assist in drawing the line between a *Terry* stop and an arrest in an individual case, the Eleventh Circuit has set forth four, non-exclusive factors for consideration.  These factors are: "'[(1)] the law enforcement purposes served by the detention, [(2)] the diligence with which the police pursue the investigation, [(3)] the scope and intrusiveness of the detention, and [(4)] the duration of the detention.'"  *United States v. Gil,* 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir. 1988)); *see also Sharpe,* 470 U.S. at 685–86.

In analyzing the first factor—the law enforcement purposes served by the detention—the Eleventh Circuit has stated that "the most important [consideration] 'is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum [amount] of interference.'"  *Gil,* 204 F.3d at 1351 (quoting *Hardy,* 855 F.2d at 759). As explained in *Hardy*:

> A *Terry* stop is justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person.  A *Terry* stop cannot be used as the basis of a "full search" that would normally be warranted only by the existence of probable cause, consent, or a valid arrest.  Nor may the police use an investigative stop to subject a suspect to custodial interrogation that would ordinarily require formal arrest and *Miranda* warnings.

855 F.2d at 759 (citations and internal quotations omitted).  Thus, the court must determine whether the officers, in this case, utilized "brief, minimally intrusive investigation technique[s]" appropriate under *Terry.  Id.*

Suspicious that Defendants were transporting a large amount of marijuana in their van, Trooper Faulk engaged Defendant Presley and Defendant Cook in conversation that would either confirm or dispel that suspicion.  While running a license check on Defendant Presley and subsequently on Defendant Cook, Trooper Faulk questioned Defendant Presley about his occupation and about his travel plans.  Gov't Ex. 1 at 3:27-4:58.  When Defendant Presley stated that he and Defendant Cook were on their way to film the end of the Masters Tournament, Trooper Faulk's suspicions were aroused because he believed that the Masters had already concluded, or was very near its conclusion.  Doc. 75 at 55:21-25.  Thirteen minutes, forty-eight seconds into the stop, Trooper Faulk issued Defendant Presley a warning.  Gov't Ex. 1.  Approximately one minute later, Trooper Faulk asked Defendant Presley for permission to search the van, and Defendant Presley stated that he "would rather [Trooper Faulk] not."  *Id.*  When consent was denied, Trooper Faulk called for the canine unit to perform an open-air search of the van.  *Id.* at 15:50.  The canine unit, which was located a few miles north of where Defendants were stopped, responded within twelve minutes.  *Id.* at 28:31.  An open-air search was performed, and Diesel alerted.  *Id.* at 29:21-29:50.  Although it is possible that the investigation techniques used by Trooper Faulk and the other officers could have been more brief, the undersigned concludes that, on the whole, the techniques used by the officers were brief and minimally intrusive.  As such, the first factor weighs in favor of the legality of the stop.

Under the second factor, the court must determine whether the police were diligent in pursuing their investigation; that is, whether the methods the police used were carried out without unnecessary delay. *See Sharpe,* 470 U.S. at 686–87; *Hardy,* 855 F.2d at 759–60. Because the officers suspected that Defendants would be traveling with a large amount of concealed drugs, they ensured that a canine unit was part of the FAP team. Immediately upon determining that a canine sniff was needed because Defendant Presley denied Trooper Faulk's request to search the van, Trooper Faulk radioed to the canine unit that had responded first to the Navigator. Gov't's Ex. 1 at 15:50. Trooper Hamrick and Diesel responded within thirteen minutes, and the open-air sniff began within a minute of their arrival. *Id*. at 28:31-29:21. While the undersigned believes that the investigation could have been more prompt by having a canine unit immediately available to search the van, that is not what is required by law. *See United States v. Borys*, 766 F.2d 304, 314 (7th Cir. 1985) (DEA agents required to have narcotics dog "readily available," not "immediately available"); *United States v. West*, 731 F.2d 90, 92 (1st Cir. 1984) (DEA agents not required to "have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible"). Because the undersigned does not question the diligence of the officers in pursuing the investigation, the second factor weighs in favor of the legality of the stop.

Under the third factor, the undersigned must determine whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety. *See Michigan v. Long,* 463 U.S. 1032, 1047–48 (1983); *Pennsylvania v. Mimms,* 434 U.S. 106, 110–11 (1977) (per curiam). The Supreme Court has stated that

officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Long,* 463 U.S. at 1051.  It follows, and Eleventh Circuit opinions confirm, that an investigatory stop does not necessarily ripen into an arrest because an officer handcuffs a suspect, *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989) or secures a suspect in the back of a patrol car, *Gil,* 204 F.3d at 1351.  While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a *de facto* arrest.  *Hastamorir,* 881 F.2d at 1556.

Based on the reasonable suspicion that Defendants were carrying a large amount of marijuana in the van, it also stands to reason that Defendants may have been carrying weapons as well.  As such, it was reasonable for Trooper Faulk to request that Defendant Presley accompany him to his police car while he was performing a license check on Defendant Presley.  It was also reasonable for Trooper Faulk to request that Defendant Presley not use his cell phone while he was seated in Trooper Faulk's vehicle, particularly in light of his knowledge that Defendants were traveling with at least one other vehicle.  It was reasonable for Trooper Faulk to ask Defendant Cook to wait by the side of the van as a safety precaution because the van had not been searched for weapons, and so that the van would not drive away.  Thus, the undersigned concludes that the level of restraint imposed on Defendants was reasonably necessary to effect the stop and ensure the safety of the officers at the scene.  The third factor weighs in favor of the legality of the stop.

The fourth and final factor is whether the duration of the detention was reasonable. There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop. *See United States v. Place,* 462 U.S. 696, 709–10 (1983) (declining to adopt an "outside time limitation" for a permissible *Terry* stop); *see also Purcell,* 236 F.3d at 1279. The test is one of "common sense and ordinary human experience." *Sharpe,* 470 U.S. at 685.

Here, Defendants were stopped for approximately thirty minutes before probable cause to search the van was established through the open-air sniff. During that time, Trooper Faulk performed a license and registration check for Defendant Presley, which took five minutes. Gov't Ex. 1 at 5:28. Trooper Faulk then issued Defendant Presley a warning, which took another eight minutes. *Id.* at 13:48. While performing the license check and issuing the warning, Trooper Faulk questioned Defendant Presley about his travel plans and occupation. *Id.* at 3:45-13:48. Immediately after issuing the warning, Trooper Faulk requested Defendant Presley's consent to search the van. *Id.* at 14:45. After consent was denied and Trooper Faulk called for the canine unit, thirteen minutes passed until the unit arrived. *Id.* at 28:31. After the canine unit arrived, an open-air sniff was performed approximately one minute later, and Diesel alerted within thirty seconds into the search. *Id.* at 29:21-29:50. At that moment, probable cause to search the van was established. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (determining that the use of a well-trained narcotics-detection dog during a lawful traffic stop is sufficiently reliable to establish probable cause to search). Considering the circumstances in this case, and in light of existing precedent, thirty minutes was a reasonable duration for Defendants to be

detained.  *See Gil*, 240 F.3d at 1350 (determining that seventy-five minutes in handcuffs in the back of a patrol car did not exceed the duration of an allowable *Terry* stop); *Hardy*, 855 F.2d at 761 (approving a fifty-minute *Terry* stop in a drug-conspiracy case); *Place*, 462 U.S. at 709-10 (Although unwilling to set an absolute time limit, holding that a ninety-minute detention of a suspect's luggage was too long for a *Terry* stop.).

Having concluded that the *Terry* stop was justified at its inception and that the stop was reasonably related in scope to the circumstances which justified the interference in the first place, the undersigned concludes that no Fourth Amendment violation occurred.

    *C.  Defendants' Motion to Suppress Statements Should Be Denied.*

In the introductory paragraphs of their motions to suppress, Defendants ask the court to suppress any statements made in conjunction with their arrests.  However, despite the court's specific instruction to do so, neither Defendant identifies any grounds in their "Issues Presented"—other than those identified in relation to the stop and search of the van—upon which the court should suppress those statements.  *See* Ord. on Arraign. (Doc. 33) at 3 ("**All grounds upon which the defendant relies must be specifically stated in the motion in separately numbered paragraphs in a section of the motion which is labeled 'Issues Presented.'.  Grounds not stated in the 'Issues Presented' section of the motion will be deemed to have been waived.**  See generally United States v. Richardson, 764 F.2d 1514, 1526-27 (11th Cir. 1985).") (emphasis in original).  Thus, if the statements made in conjunction with Defendants' arrest are to be suppressed, they

would be suppressed only under the "fruit of the poisonous tree" argument.[13]  *See, e.g.,*
*Nardone v. United States*, 308 U.S. 338, 340-41 (1939).  Defendants have waived any other
grounds under which the statements might be suppressed.

In their motions to suppress, neither Defendant identifies any particular statement
that they wish to be suppressed.  Nor does either Defendant identify any piece of
evidence—such as the recording of Defendants conversing at the police station after they
were placed in a wired conference room—that they wish to be suppressed.  At the
suppression hearing, while both Defendants stated, after the undersigned's prompting, that
they were requesting that the court suppress statements made in conjunction with their
arrests, *see* Doc. 75 at 4:13-7:12, neither Defendant identified through the course of the
hearing any such statement that they wished to be suppressed, nor did they introduce into
evidence the recording which, the court presumes, would contain the statements that they
wish to have suppressed, *id*. at 115:13-118:20.  Neither Defendant requested leave of the
court to continue the hearing or to file supplemental briefs with the court to address
suppression of statements.

Because the undersigned concludes that Defendants' Fourth Amendment rights
were not violated as a result of the stop and search of the van, the undersigned is unable to
suppress any statements made in conjunction with Defendants' arrest based upon a fruit of
the poisonous tree argument.  Further, even if the undersigned wished to suppress such

---

[13] The undersigned notes that to the extent that Defendant Cook is arguing that his statements should be
suppressed as fruit of the poisonous tree of an illegal search of the van, Defendant Cook does not have
standing to make such a challenge.

statements, no such statements are in evidence. To the extent that Defendants have moved to suppress statements made in conjunction with their arrests, that motion is due to be denied.

## VI.    CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Defendant Presley's motion to suppress (Doc. 48) and Defendant Cook's motion to suppress (Doc. 68) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **September 6, 2016**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

34

Done this 23rd day of August, 2016.

/s/ Wallace Capel, Jr.
UNITED STATES MAGISTRATE JUDGE